**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN F. TAMBURO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | Case No. 04 C 3317 |
| STEVEN DWORKIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

The essential facts in this 2004 case are undisputed. Defendant Kristen Henry, a dog breeder and computer programmer, spent almost five years creating an extensive database of dog pedigrees, which she made freely available for use by fellow breeders through her web site. Plaintiffs John Tamburo and Versity Corporation ("Versity") used an automated web browser to harvest the data from Henry's website. They incorporated it into software which they attempted to sell to dog breeders for a profit. Henry was outraged. When the plaintiffs spurned her requests to cease using her data, she reached out to the dog breeding community, through emails and online messages, for assistance in responding to the plaintiffs' misappropriation of her work. This lawsuit arose from her statements.

Tamburo and Versity filed a Seventh Amended Complaint on June 28, 2010. The counts remaining in the case are tortious interference with a contractual relationship (II), tortious interference with prospective economic advantage (IV), defamation *per se* (VIII), and defamation *per quod* (IX). Henry filed a motion for summary judgment on January 31, 2013. After repeated extensions and the withdrawal of the plaintiffs' counsel, a pro se response was

filed by Tamburo on August 26, 2013, and Henry replied on September 10, 2013.[1]  For the reasons explained below, Henry's motion for summary judgment is granted in its entirety.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).  The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial.  *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

A brief discussion of the rules governing summary judgment motions is warranted here. In addition to complying with the Federal Rules of Civil Procedure, the parties must also adhere to the Local Rules for the Northern District of Illinois and this court's Standing Order.  Local Rule 56.1 provides that the moving party shall serve and file:

1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e);

2) a supporting memorandum of law; and

3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law . . . .

The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the

---

[1] Versity is not currently represented by counsel and has not filed its own response to the motion. Although individuals may proceed pro se, "a corporation may appear in the federal courts only through licensed counsel." *Rowland v. California Men's Colony, Unit II Men's Advisory Counsel*, 506 U.S. 194, 201-02 (1993).  A non-movant's failure to respond to a motion for summary judgment, however, does not automatically result in a judgment in favor of the movant.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).  The ultimate burden of persuasion remains with the movant to show that she is entitled to judgment as a matter of law, *id.* at 608, and the court evaluates Henry's motion in light of that rule.

record, and other supporting materials relied upon to support the facts set forth in that paragraph.

L.R. 56.1(a). All argument must be contained in the party's brief, not in the Rule 56.1 statement. Standing Order at 1-2.

The party opposing summary judgment is required to respond with its own supporting evidence, memorandum, and "concise response to the movant's statement . . . ." L.R. 56.1(b). The opposing party's Rule 56.1(b) statement should also contain "any additional facts that require the denial of summary judgment." *Id.* The opponent must include references to its supporting materials. *Id.* Failure to respond to a statement results in the court admitting the uncontroverted statement as true. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Henry has not responded to Tamburo's Statement of Additional Facts, and those facts are deemed admitted to the extent that they are supported by record evidence.[2]

## II. FACTS

Tamburo is an Illinois citizen. Versity was incorporated in March 1999 and voluntarily dissolved on May 10, 2004. Versity's principal place of business was Frankfort, Illinois. Versity did business under the name "Man's Best Friend Software" ("MBFS"). After Versity's dissolution, Tamburo conducted business as MBFS. Defendant Henry is a Colorado citizen. The other defendants in this action are or were Steven Dworkin, a Canadian citizen who is deceased; Roxy Hays, a Michigan resident who filed for bankruptcy on November 24, 2010

---

[2] As support for most of his Statement of Additional Facts, Tamburo relies on his own affidavit. The affidavit states, "I was present with Kristen Henry, my former attorney Ian Brenson, and Henry's attorney Mark Petrolis at the Mudd Law Offices in Chicago, Illinois, on December 21, 2011. During this meeting, Henry was questioned under oath, and did admit all of the following facts in My [sic] hearing." (Pl.'s Statement of Additional Facts ("SOF") Ex. A (Tamburo Aff.) ¶ 4, ECF No. 536-3.) The court has found little precedent for relying on an affidavit as to statements made during a deposition rather than citing the actual deposition transcript. But the statements attributed to Henry are not hearsay as they are admissions by a party-opponent. *See* Fed. R. Evid. 801(d)(2). Nor does the affidavit run afoul of the "best evidence" rule, Federal Rule of Evidence 1002, because it was not offered to prove the contents of a writing. *See In re Lang*, 106 F.3d 413 (10th Cir. 1997) (table). Therefore, although the court finds the procedure resorted to by Tamburo odd, it finds no basis to strike the statements.

(ECF No. 371); Karen Mills, an Ohio resident; and Wild Systems Pty, Ltd., an Australian company that was previously dismissed for lack of personal jurisdiction. The court previously held that Tamburo could not proceed against Dworkin on Counts VIII and IX, because the defamation claims did not survive Dworkin's death. (Order Jan. 11, 2012, ECF No. 483.) A default was entered against Mills on May 11, 2011. (ECF No. 421.)

## A. Bonchien.com and the Data Mining Robot

Henry operated breeding kennels and sold dogs, but also has substantial knowledge of web development and computer programming. During the relevant period, she operated a website, Bonchien.com, containing a database of pedigree data for a small, mischievous Belgian dog breed called the Schipperke. *See* http://www.akc.org/breeds/schipperke/breed_standard.cfm. According to Henry's affidavit, the website was developed for non-commercial use by the dog breeding community. The site provided free access to the information. A user could conduct a query search for an individual dog's pedigree. The data collected included dogs' names, dates of birth, gender, parents' names, offspring's names, showing titles, color, medical certifications, and registration numbers. Henry states that she marked the individual dog pedigrees with a unique code in order to identity the pedigrees she had compiled, although Tamburo states that her "code" merely involved inserting slashes into the pedigrees. Henry spent almost five years collecting the dog pedigree data contained in her database from different sources. As of around April 2004, she had collected data in her database on over 23,900 dogs.

From December 8, 1991, through May 2004, Versity created software products for use by animal breeders and pet groomers. On January 9, 2004, Versity launched The Breeder's Standard™NET ("TBS"), a web-based dog pedigree software program. The program operates as a database designed for research and genetic calculations. Tamburo developed a computer

4

program that used a web browser to scan the internet for information about dog breeds and copy data from dog pedigree websites ("the Data Mining Robot"). The data was saved as a text file and incorporated into TBS. Tamburo copied only data, not the formatting of the sites.

On or around April 17, 2004, the Data Mining Robot created by Tamburo visited Bonchien.com and copied the information on the website. It also copied information in databases belonging to Dworkin, Hayes, and Mills. The information was incorporated into TBS. On April 29, 2004, Tamburo posted a statement on the MBFS website describing the Data Mining Robot's gathering of data. On May 4, 2004, Dworkin sent an email to Henry stating that her database might have been harvested by the Data Mining Robot. Henry thus learned of the plaintiffs' conduct.

## B. Henry's Statements

Henry states in her affidavit that she felt frustrated and violated by the plaintiffs' use of her database. Henry told Tamburo that he had no right to collect data from her website in an automated manner and requested that he remove her data from TBS. The plaintiffs refused to comply with Henry's request.

On May 4, 2004, Henry posted a message to the Schipperke Yahoo!Group, an online message board for dog breeders. The subject line of the message was "My Schipperke Database has been stolen, and The Breeders Standard is the thief." The message stated:

> "Breeders Standard has stolen my Schipperke database and is offering it as a perk if you buy their software. Schipperke people, you don't need that perk, as you already have my site to use for free. Steve, I too noticed that the 23900 dogs that I keyed in all by myself to chronicle the history of the Schipperke breed have been stolen. . . . I feel frustrated and violated.
>
> I am asking the Schipperke fancy [sic] to complain loudly to MBFS. Why should I do all this work so MBFS can steal it and sell their software with this stolen perk?

5

> I will add a statement to my website about MBFS deceitful practice. . . . Perhaps if we contact news service who would be interested in a story on intellectual capital rights and the internet.  I offer my data free for use to the Schipperke fancy [sic], not for a price, or to be held hostage by MBFS.

(Pl.'s Statement of Facts ("SOF") Ex. U, ECF No. 536-8.)

On May 5, 2004, Henry sent Tamburo an email, copying members of the Schipperke Yahoo!Group, stating that Tamburo was trying to sell his customers "stolen goods."  (Pl.'s SOF Ex. R, ECF No. 536-5.)   Later that day, she sent another email to Tamburo, copying the Schipperke Yahoo!Group, the American Kennel Club, and other breeders, stating:

> You keep saying that you aren't charging for the data on your site that you took from mine.  Your perspective is such a Joke because without the data on your site you would not have any value. . . . Will you also be using a Robot to mine data from the AKC.org site?  I am sure they wouldn't appreciate that either. . . . I feel violated and your perspective escapes me you alleged unethical dolt.

(Pl.'s SOF Ex. H, I, ECF No. 532-8.)  The email displays an earlier message from Henry stating:

> You are not entitled to the endless hours I spent compiling the data relationships.  You cannot simply copy my database into yours without permission and start charging money for it.  I have copyright statements on my site to boot.  I do not give you permission to use that which you took from my domain without my permission.  Again, shame on you MBFS.

(*Id.*)

Later that day, Henry sent another email to the Schipperke Yahoo!Group stating "we have a few ideas.  The court of public opinion is a powerful thing."  (Pl.'s SOF Ex. J, ECF No. 532-10.)  She wrote another email to the group, with copies to other breeders and the American Kennel Club, stating:

> MBFS has written an agent robot to go to these individual sites and steal certain files (Alfirin pedigree database files) that were not offered to them except through a query user interface for page by page query of a single dog's pedigree at a time.
>
> John is focusing on the dog information.  He did not have and still does not have my permission to take or use the set of Schipperke data that I compiled for a specific type of manipulation and distribution on my web site.  MBFS has

targeted and stolen my personal data files from non public areas of my website domain.

(Pl.'s SOF Ex. P, ECF No. 532-16.)

Also on May 5, 2004, Henry posted a message on her website stating:

[In] May 2004, MBFS (The Breeder's Standard) has stolen the Pedigree Databases of many breeds including this one using a Data Mining Robot. They are now offering access to this data for use at $9.95/month from their site. I spent the last 4.5 years keying this data in. MBFS stole it in one day.

Please complain by email or phone to [Tamburo's contact information].

(Pl.'s SOF Ex. O, ECF No. 532-15.)

That evening, Henry sent a message to the Schipperke Yahoo!Group stating,

I want to let you all know that there are now a few irons in the fire regarding other people he has stolen from too, and also, some of the National Dog Clubs . . . are stepping up to lend an ear and possibly some support especially with getting some important big players on board and in the loop. . . . Also, now that you have all seen the ethics and behavior of MBFS/TBS and Versity . . . please consider supporting the good, and take your business elsewhere.

(Pl.'s SOF Ex. S, ECF No. 536-6.)

Henry exchanged emails with an individual named Eileen Lane on May 5, 2004. Henry told Lane that the plaintiffs "wrote an agent robot to take specific files off of specific sites and return them to their computer. The data files were not in a public venue." Henry also told Lane that this constituted "Hacking." Lane responded by email with a link to an article she wrote on her forum, www.freerepublic.com. (Pl.'s SOF Ex. M, ECF No. 532-13.) The text of the article itself is not part of the exhibits submitted in support of the parties' Statements of Facts.

Henry organized, with the other individual defendants, an invitation-only Yahoo!Group called the "APDUG group." (APDUG stood for Alfirin Pedigree Database Users Group. Alfirin provides free software used to create pedigree databases for animal breeds.) Henry wrote to the group on May 6, 2004, stating that "we want to collect data here to help support our cause, that

of our pedigree data being taken without permission by MBFS to make a profit. . . . We are also keeping the list invitation only so we can try to keep only Alfirin database folks as members." (Pl.'s SOF Ex. N, ECF No. 532-14.)  On May 7, 2004, Henry wrote the group stating that she "would like to make a list or record of all the Pedigree Databases that were harvested by MBFS . . . . If you provide me with tell-tale ways to look for data from your site, I will provide it to my friend who has subscribed for this purpose."  (Pl.'s SOF Ex. Q, ECF No. 532-17.)

On May 9, 2004, Henry posted to the APDUG Yahoo!Group, stating:

> None of us like what happened but there is only so much we can do about the public data part. . . . [M]y Lawyer says there isn't anything we can do about the 'public data' part of the problem.  We can, and are, working on the Ethics part of the problem by sharing with the masses the story of what happened to so many of us. . . . We can also get the word out that we have the data for free, and that people do not have to pay to see it. . . . One thing we must do is get smarter and smarter and not make the mistake of libel or slander just for sport. . . . Please, it would be out of context to share posts that would do nothing else but fuel Dear John's unique style. . . . Simply spread the word far and wide that he took for himself something that was so unethical to do, and now you have to pay to see it . . . shame on him.

(Def.'s SOF Ex. M, ECF No. 510-13.)  Henry states in an affidavit that she believed at the time, and still believes, that her statements about the plaintiffs' conduct were true.

## C.  Henry's use of the Robot Exclusion Standard

The parties dispute whether Tamburo and Versity evaded security measures to access Bonchien.com.  Henry contends that a user could access the data on her site only through a query based search, by entering an individual dog name and the generations of ancestry to be displayed.  Tamburo, however, states that the data could also be accessed through the site's URL.  He states in his affidavit that Henry admitted during her deposition that the URL used by the Data Mining Robot to access the web site was plainly visible, and that her allegations that the plaintiffs accessed data from non-public areas of the web site were false.

Henry states in an affidavit that she did not give Tamburo or Versity express permission to access and gather the data on her website by any automated means, such as the Data Mining Robot. She contends that she placed a "robots.txt" header on the site to keep robots from indexing the site. The robots.txt protocol, or Robot Exclusion Standard, is a convention "to instruct cooperating web crawlers not to access all or part of a website that is publicly viewable. If a website owner uses the robots.txt file to give instructions about its site to web crawlers, and a crawler honors the instruction, then the crawler should not visit any pages on the website. The protocol can also be used to instruct web crawlers to avoid just a portion of the website that is segregated into a separate directory." *Associated Press v. Meltwater U.S. Holdings, Inc.*, No. 12 Civ. 1087, 2013 WL 1153979, at *23 (S.D.N.Y. Mar. 21, 2013).

Tamburo claims, however, that a visible robots.txt file was not placed on Bonchien.com until May 10, 2004, after his Data Mining Robot visited the site, and that such a file was not visible on the site when he visited it. He also states that Henry admitted during her deposition that the industry standard regarding automated browsing program is to look for a robots.txt file or robot exclusion headers. She further admitted that no robots.txt file was visible to an external browser on the date the Data Mining Robot visited the site because the file had been placed in the "root of the server" and not the "root of the web site," that no terms or conditions on the site restricted or prohibited the use of an automated program to access the web site, that the web site lacked any sort of robot exclusion META headers, and that the plaintiffs had not circumvented or attempted to circumvent any security protocol on the site.

Tamburo claims that the web browsing program was deployed only to websites that had no robots.txt file prohibiting robots, no META tag prohibiting robots, and no visible terms of service that prohibited automated browsing. He denies attempting to circumvent any website's

9

security protocols. Tamburo cites a May 6, 2004, email from Henry to the APDUG Yahoo!Group stating that Tamburo "claims he first checked for robot.txt and [a] Meta tag . . . prior to taking in the content." (Pl.'s SOF Ex. L, ECF No. 532-12.) Tamburo also points to usage logs from Henry's site showing that no robots.txt file was browsed in April 2004, and a digital archive of the site showing the presence of the robot.txt file only after May 10, 2004. (Pl.'s SOF Ex. F, ECF No. 532-6.) Tamburo also states that he has been unable to locate any copyright registered to Henry.

Tamburo states in his affidavit that Henry admitted during her deposition that she consulted with two attorneys, both of whom advised her, prior to the publications at issue, that the plaintiffs had committed no unlawful act.

## D.  Lost Contracts and Damages

Tamburo claims that Henry told the people on the message boards to take their business elsewhere, citing the statements listed above. He argues that, as a result, he has suffered lost contracts and sales. In support, he cites his own affidavit, which states, "My estimate of lost sales attributable to Henry's defamations is, as of August 13, 2013, in excess of $2,469,800.00, in contracts cancelled, and in sales not realized because of the damage wrought by Henry and her cohorts in the APDUG Group acting at her direction, and in depletion of the value of the business, which continues to this day." (Tamburo Aff. ¶ 20.) The estimate of lost sales is based on Tamburo's statement that Versity had $3,538.98 in sales from May 1-4, 2004, and $184.60 in sales from May 5-7, 2004. (*Id.* at ¶¶ 18-19.) Versity was dissolved on May 10, 2004.

Tamburo further states in his affidavit, "I had a valid expectancy to enter into business relationships with Mavis Taylor and Cathy Gaul-Montgomery to sell my products." (*Id.* at ¶ 23.) In support, he points to two emails dated May 5, 2004. The first, from Kathy Gaul-Montgomery,

10

states, "What a shame your company has sunk so low as to steal data from the Schipperke group and abuse Kristen Henry's hard work. I won't ever use your services." The second, from a person named "Margie," states, "You Mr. Tamburo are a low lying snake belly scum sucking rat that doesn't have the gut to do the work yourself . . . for what you have done you should be quartered and hung. . . ." (Pl.'s SOF Ex. K, ECF No. 532-11.) Tamburo's affidavit further states that "numerous additional third parties . . . refused to do business with John as a direct and proximate result of Henry's defamatory statements and those made by her APDUG Group cohorts acting on her instructions." (Tamburo Aff. ¶ 25.) He further states that Henry sought the identities of his customers and the breed coordinators of TBS for the purpose of causing disciplinary action to be taken against them by the Schipperke Club of America and the American Kennel Club.

On May 11, 2004, Tamburo and Versity filed a complaint in this action. Nine years later, four of the counts in the plaintiffs' Seventh Amended Complaint remain. Versity claims tortious interference with a contractual relationship (II) and tortious interference with prospective economic advantage (IV), while Tamburo asserts claims of defamation *per se* (VIII), and defamation *per quod* (IX).

## III. ANALYSIS

### A. Count II: Tortious Interference with a Contractual Relationship

In Count II, Versity brings a claim for tortious interference with a contractual relationship. Under Illinois law, such a claim requires the plaintiff to prove (1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005). Plaintiff Versity has produced no evidence on the first element—the

existence of a contract. It is thus "unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial." *Kidwell*, 679 F.3d at 964. Summary judgment is granted in favor of Henry on Count II.

## B. Count IV: Tortious Interference with Prospective Economic Advantage

In Count IV, Versity brings a claim for tortious interference with prospective economic advantage. Under Illinois law, Versity is required to show: (1) "'a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (quoting *Evans v. City of Chi.*, 434 F.3d 916, 929 (7th Cir. 2006)). In *Ali v. Shaw*, 481 F.3d 942, 945 (7th Cir. 2007), the Seventh Circuit noted that numerous Illinois appellate courts have also required the plaintiff to demonstrate "a business expectancy with a specific third party." *Id.* at 946 (quoting *Schuler v. Abbott Labs.*, 639 N.E.2d 144, 147 (Ill. App. Ct. 1993), and *Assoc. Underwriters of Am. Agency*, 826 N.E.2d 1160, 1169 (Ill. App. Cit. 2005)).[3]

Versity has presented no evidence that it had a reasonable expectation of entering into a valid business relationship with a specific third party. The only evidence[4] regarding specific persons who declined to do business with Versity consists of two emails from people,

---

[3] This court's December 29, 2010 opinion declined to dismiss Count IV, explaining that Tamburo was not required to *allege* a specific third party to survive a motion to dismiss. *Id.* at *6-7. As the case is now at the summary judgment stage, more is required. *See Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (internal citation and quotation marks omitted).

[4] The court recognizes that this evidence was submitted by Tamburo, not Versity, and that Tamburo may not appear pro se on behalf of Versity, a corporation. But the evidence obviously bears on the question of whether Versity had a reasonable expectancy of entering into a valid business relationship with a third party, and the court deems it more expeditious to consider the evidence than to disregard it.

presumably dog breeders, who maligned Tamburo for his conduct. One writer, Kathy Gaul-Montgomery states, "I won't ever use your services." The other, "Margie," suggested that he should be "quartered and hung." This is insufficient evidence to defeat Henry's motion for summary judgment. There is no evidence that Versity communicated with Ms. Gaul-Montgomery or the colorful "Margie" (who Tamburo calls "Mavis") prior to Henry's statements or had any reasonable expectation—or anything more than a thin hope—of selling them services. *See, e.g.*, *Hoopla Sports and Entm't, Inc. v. Nike, Inc.*, 947 F. Supp. 347, 358 (N.D. Ill. 1996) ("The hope of receiving a[n] . . . offer is not a sufficient expectancy.") (quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)). Summary judgment is granted in favor of Henry on Count IV.

## C. Count VIII: Defamation *Per Se*

Tamburo alleges that some of the statements made by Henry in May 2004, protesting Tamburo's harvesting of her data without permission, constitute defamation. He argues that the defamatory statements include accusations of 1) theft; 2) selling stolen goods; 3) "hacking"; 4) copyright infringement; and 5) removing data from Bonchien.com.

Under Illinois law, a plaintiff asserting a defamation claim must demonstrate that the defendant made a false statement about the plaintiff, that the statement was published to a third party, and that the publication caused damage to the plaintiff. *Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988). A plaintiff need not prove special damages if a statement is defamatory *per se*. In *Cody v. Harris*, the Seventh Circuit explained the types of statements that can constitute defamation *per se*:

> Some statements are considered defamatory *per se* because they are so obviously and materially harmful to a plaintiff that his injury may be presumed and he does not need to prove actual damages to recover. There are five such categories of statements in Illinois: (1) those imputing the commission of a criminal offense;

> (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those imputing a lack of ability, or that prejudice a party in his trade, profession, or business; and (5) those imputing adultery or fornication.

409 F.3d 853, 857 (7th Cir. 2005) (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214-15 (Ill. 1996)).

The statements at issue here suggest that Tamburo lacked integrity in carrying out his business affairs, because he "stole" data from Henry and the other defendants and then attempted to sell it to customers. The statements can be considered defamatory *per se*. *See, e.g.*, *id.* at 858 (distinguishing between attacks on personal integrity and attacks on integrity with regard to job performance); *Kumaran v. Brotman*, 617 N.E.2d 191, 199 (Ill. App. Ct. 1993) (article accusing teacher of filing "scam" lawsuits was defamatory *per se* because teacher's job is to serve as a role model for students).

Certain factors, however, render defamatory statements non-actionable as a matter of law. *Hopewell v. Vitullo*, 701 N.E.2d 99, 102 (Ill. App. Ct. 1998). A statement is non-actionable if it is substantially true, *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 2008); capable of innocent construction, *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003); an opinion that does not misstate actual facts, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); or rhetorical hyperbole, *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201 (Ill. 1992). An allegedly defamatory statement may also be protected by a privilege. *DePinto v. Sherwin-Williams Co.*, 776 F. Supp. 2d 796, 804 (N.D. Ill. 2011) (citing *Kuwik v. Starmark Star Mktg. and Admin., Inc.*, 619 N.E.2d 129, 135 (Ill. 1993)).

1.  Accusations of Theft

Tamburo first argues that Henry's statements that he committed theft are defamatory.

Henry made numerous statements on message boards, through emails, and on her website about

TBS stealing her data.  On May 4, she made the following statements:

- My Schipperke Database has been stolen, and The Breeders Standard is the thief.

- Breeders Standard has stolen my Schipperke database . . . .

- [T]he 23900 dogs that I keyed in all by myself to chronicle the history of the Schipperke breed have been stolen. . . .

- Why should I do all this work so MBFS can steal it and sell their software with this stolen perk?

- I will add a statement to my website about MBFS deceitful practice

On May 5, 2004, Henry sent additional messages stating:

- Tamburo was "not entitled" to her data and "took [it] from [her] domain without [her] permission."

- MBFS has written an agent robot to go to these individual sites and steal certain files . . . .

- MBFS has targeted and stolen my personal data files from non public areas of my website domain.

- MBFS (The Breeder's Standard) has stolen the Pedigree Databases of many breeds including this one using a Data Mining Robot. . . . MBFS stole it in one day.

- [T]here are now a few irons in the fire regarding other people he has stolen from too . . . .

Henry also referred to Tamburo's behavior as "unethical" on several occasions.

First, Henry's statements that Tamburo's actions were "unethical" and "deceitful" are not

actionable.  The First Amendment protects opinions that do not misstate actual facts.  *See*

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *see also Moriarty v. Greene*, 732 N.E.2d

730, 739 (2000).  A plainly subjective remark is not actionable.  *Wilkow v. Forbes*, 241 F.3d 552,

555 (7th Cir. 2001).  Whether a person's actions are ethical or deceptive is not objectively

verifiable.  *See Lifton v. Bd. of Educ. of the City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005).

*See also Hopewell v. Vitullo*, 701 N.E.2d 99, 104 (Ill. App. Ct. 1998) (concluding that the

statement "fired because of incompetence" did not have a "precise and readily understood meaning," and that "the veracity of the statement" was unverifiable).

Nor are Henry's statements that Tamburo's actions constituted "theft" actionable as defamation, because the statements were substantially true. "Truth is an absolute defense to a defamation action." *Lerman v. Turner*, No. 10 C 2169, 2013 WL 4495245, at *18 (N.D. Ill. Aug. 21, 2013) (citing *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 2008)). The statement at issue need not be completely accurate; the defense applies if "the 'gist' or 'sting' of the statement is true." *Id.* (quoting *J. Maki Constr. Co. v. Chi. Reg'l Council of Carpenters*, 882 N.E.2d 1173, 1186 (Ill. App. Ct. 2008)); *see also Coghlan v. Beck*, 984 N.E.2d 132, 146 (Ill. App. Ct. 2013). The truth of a statement is usually a question for the jury, but may be resolved on summary judgment if "no reasonable jury could find that substantial truth had not been established." *Id.* (citing *J. Maki Constr. Co.*, 882 N.E.2d at 1186).

Here, there is no dispute that Henry's description of the events in question was accurate: the plaintiffs harvested data from Henry's web site that she had spent years collecting, they repackaged it for their own use and profit, and they did not have Henry's permission to use the data harvested from the site. The only question is whether Henry's characterization of these events as "theft" is false.

Tamburo argues that Henry's statements that he stole from her are false because he did not commit theft. He did not delete or remove data from Henry's site (thus depriving her of her property), Henry had made her data freely available, and no robots.txt file was visible on her site at the time the Data Mining Robot copied information on the site. According to Tamburo, because the data was not protected, either legally or by security protections on Henry's web site, he could not have committed theft by appropriating it.

16

Even so, the court concludes that no reasonable jury could find that Henry's statements were not substantially true. Henry accurately reported in her messages that Tamburo copied data from her site without her permission, and it is undisputed that he did so. Henry states under oath that she believed (and still believes) that this constituted theft, and that she felt injured by Tamburo's actions. It may be true that Tamburo could not be prosecuted or held liable for his actions because the data was publicly available and not protected by adequate security measures. But Tamburo's argument relies on a narrow legal meaning of "theft." Under Illinois law, the court must consider whether Henry's use of the word "theft" is reasonably susceptible to a non-defamatory construction. *Solaia Tech., LLC v. Specialty Pub. Co*., 852 N.E.2d 825, 839 (Ill. 2006). It is. To a lay person such as Henry, "theft" can also mean the wrongful act of taking the property of another person without permission. The data Henry had collected could be reasonably understood as her property—she had collected it, and it was her work in compiling it that gave it value. She did not give Tamburo permission to copy it and sell access to it. Although Henry might not be able to successfully sue Tamburo for using her data in this way, the gist of her statements was true: he took the data without her permission.

Alternatively, the court concludes that Henry's statements that Tamburo's actions constituted theft are subject to a qualified privilege. Such a privilege may exist "where the situation involves an interest of the person who publishes the defamatory statement or an interest of the person to whom the matter is published. *DePinto*, 776 F. Supp. 2d at 804 (citing *Kuwik*, 619 N.E.2d at 135). Courts also recognize as privileged communications involving a recognized public interest. *Kuwik*, 619 N.E.2d at 134. Whether a qualified privilege exists is a question of law for the court. *Id*. at 133.

Henry's statements are privileged because they related to her interests in protecting the substantial time and effort spent accumulating her data and in making it freely available to the community of Schepperke breeders, to promote the health of the breed. She also had an interest in ensuring that her data was presented in a certain way and in controlling the manner in which it could be accessed. Furthermore, the statements were published to people who likewise had an interest in the way in which the dog pedigree data was made available, and they involved a public interest in how access to information available on the internet is regulated.

"The qualified privilege serves to enhance a defamation plaintiff's burden of proof." *Id.* at 133. The privilege may protect the speaker from liability regardless of the statement's contents. *Id.* To overcome the privilege, the plaintiff must show not just that the statements were untrue, but that the defendant abused the privilege by intentionally publishing false material or by displaying a "reckless disregard" as to its truth or falsity—meaning that the defendant "entertained serious doubts about the truth of the statement but failed to properly investigate the truth." *DePinto*, 776 F. Supp. 2d at 804 (citing *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1167 (7th Cir. 1998)). *See also Smock v. Nolan*, 361 F.3d 367, 372 (7th Cir. 2004). Abuse of a privilege may also occur when the defendant fails to "limit the scope of the material, or send the material to only the proper parties." *Kuwik*, 619 N.E.2d at 136.

Whether a privilege was abused is usually a question of fact for the jury. *Kuwik*, 619 N.E.2d at 133. "However, just because an issue is generally one for a trier of fact to resolve does not mean that a defamation plaintiff is automatically entitled to present his case to a jury when a qualified privilege applies. A court may determine that as a matter of law insufficient facts are alleged . . . to show an abuse of the applicable qualified privilege." *Huon v. Beatty*, No. 1-09-2234, 2011 WL 9717454, at *6 (Ill. App. Ct. Mar. 25, 2011).

Here, Tamburo has presented no evidence that Henry abused the qualified privilege, either by intentionally making false statements or by acting with "reckless disregard" as to the truth of her statements. Henry claims that she believed (and still believes) that her statements were true, and nothing in the record raises an issue of fact as to whether, at the time the statements were made on May 4 and 5, 2004, Henry entertained doubts about whether her data was in fact "stolen." Henry had personal knowledge that the data had been copied, and her statements were based on that undisputed fact. *See Xinos v. O'Brien*, No. 2-12-0997, 2013 WL 1798844, at *9 (Ill. App. Ct. Apr. 25, 2013). Furthermore, the statements were limited in scope to Tamburo's harvesting of Henry's data, and they were made to a community of dog breeders who shared Henry's interest in maintaining the availability of the data and protecting the rights of those who had worked for years to compile it. Through her publications, Henry reached out to that community for help in finding some remedy for her injury.

Tamburo contends that Henry admitted during her deposition that lawyers told her she had no legal recourse against Tamburo and Versity, and that prior to the publications, she had been advised that the plaintiffs had committed no unlawful act. Furthermore, on May 9, 2004, Henry stated to the APDUG Yahoo!Group that "[M]y Lawyer says there isn't anything we can do about the 'public data' part of the problem." Tamburo argues that, based on the advice from her lawyers, Henry had actual knowledge of the falsity of her statements. He further argues that Henry was obligated to investigate the legality of his actions before making her statements and that, by failing to do so, she abused the qualified privilege.

Henry's May 9, 2004, statement indicates that she eventually concluded that she could pursue no copyright infringement claim or other type of legal action against Tamburo. But Henry was a lay person, and the record shows plainly that as of May 4 and 5, 2004, when she

made the statements that her data was "stolen," Henry believed that Tamburo had stolen her data and was attempting to determine whether the law afforded her any protection against that theft.

Moreover, even had Henry immediately consulted with an attorney, no such actual knowledge that Tamburo's actions were lawful would have been revealed. Rather, in May 2004, the law governing the automated harvesting of data from web sites was unsettled. For example, a number of courts had held that website owners might have a remedy under the Computer Fraud and Abuse Act ("CFAA") against defendants who had accessed information on their websites using automated harvesting. *See Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *13 (N.D. Tex. Sept. 12, 2007) (collecting cases). In 2003, the First Circuit reversed a district court that had issued an injunction pursuant to the CFAA against a company using an automated "web scraper" to copy pricing information from a travel website. The district court had relied in part on "the fact that the website was configured to allow ordinary visitors to the site to view only one page at a time." *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62 (1st Cir. 2003). The First Circuit disagreed and noted, "It is . . . of some use for future litigation . . . in this circuit to indicate that, with rare exceptions, public website providers ought to say just what non-password protected access they purport to forbid." *Id.* at 64.

The First Circuit's opinion suggests that it is unlikely Henry could have pursued a CFAA claim, given the state of the law, and Tamburo is correct that a collection of data is normally not subject to copyright protections. *See Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 364 (1991) (noting that "copyright rewards originality, not effort"). Even so, further investigation on Henry's part would not have revealed that Tamburo's actions were undisputedly legal or illegal. Thus, even if Henry's lawyer advised her that Tamburo had acted legally and that she did not have a remedy against him, such advice is not dispositive as to whether she abused the qualified

privilege in making the statements in question. Henry was entitled to disagree with the lawyer about whether Tamburo had any right to access her database, another lawyer might have held a different opinion, and her statements were made as part of her efforts to seek help in protecting her interests. Thus, the fact that the law has evolved in a way that does not protect Henry's years of work is not evidence that she made the statements about Tamburo's theft with "a high degree of awareness of the[ir] probable falsity or entertaining serious doubts as to [their] truth." *Kuwik*, 619 N.E.2d at 133.

Tamburo also argues that Henry knew that, because she did not properly protect her website with the Robot Exclusion Standard and stated that her data was freely available to the public, Tamburo was entitled to copy her data. He argues that by failing to adopt a robots.txt protocol to limit the access of web crawlers to her website, Henry effectively invited him to use the data, and thus knew his actions were not "theft."

The court has found no precedent indicating that failure to use the Robot Exclusion Standard means that a website creator has given up her intellectual property rights or invited the general public to copy the material on a site. To the contrary, in the copyright context, one district court recently rejected the idea that a website's failure to use the robots.txt protocol to block access created an implied license to copy copyrighted material. *Associated Press*, 2013 WL 1153979, at *24. That court stated that "there is no fair inference, based simply on the absence of the robots.txt protocol, that there has been a meeting of the minds between the copyright owner and the owner of the web crawler about the extent of copying." *Id.* It follows that the failure to use the robots.txt protocol is not evidence that Henry knew that Tamburo was allowed to copy her data and knew that her statements that he had stolen her data were false.

Thus, besides being substantially true, Henry's statements about Tamburo's actions constituting "theft" are protected by a qualified privilege, and Tamburo has presented no evidence that Henry abused that privilege. She did not make the statements with knowledge of or a reckless disregard for their falsity, fail to limit the scope of the statements properly, or send them to improper parties. The court concludes that there is insufficient evidence that Henry abused the qualified privilege to submit the question to the jury. See *DePinto*, 776 F. Supp. 2d at 807; *Anglin v. Sears Roebuck & Co.*, No. 93 C 3438, 1998 WL 483524, at *8 (N.D. Ill. Aug. 10, 1998) ("[A]buse of a qualified privilege cannot simply be asserted to defeat a motion for summary judgment. Plaintiff has the burden to provide sufficient evidence to create a genuine issue of material fact; absent such evidence, summary judgment is appropriate."). The statements accusing Tamburo of theft are not actionable as defamation.

2.  "Selling Stolen Goods"

Tamburo argues that Henry's statement that he was "selling stolen goods" falsely imputed the commission of a crime and thus constitutes defamation *per se*. He claims that Henry knew the statement was not true because her attorneys had advised her that his actions were legal, and because Henry knew that she had not been deprived of any tangible property.

Henry made the statement that Tamburo was "selling stolen goods" on May 5, 2004. The court agrees that the statement is defamatory *per se*, because it calls Tamburo's professional integrity into question. But, just as the statements about theft are substantially true, so is the statement that Tamburo was selling stolen goods. It is undisputed that Tamburo attempted to make a profit using data that he had copied from Henry's website without her permission.

Additionally, the statement is protected by a qualified privilege, for the same reasons that the statements about theft discussed above are protected. And, for the same reasons, Tamburo

22

has not submitted evidence that creates a genuine issue of fact with respect to whether Henry made the statement based on a reasonable belief that it was true. Absent any evidence that Henry abused the privilege, the statement is not actionable.

3. "Hacking"

Henry exchanged emails with Eileen Lane on May 5, 2004. Henry told Lane that the plaintiffs "wrote an agent robot to take specific files off of specific sites and return them to their computer. The data files were not in a public venue." Henry also told Lane that this constituted "Hacking." Lane posted an article on her forum, www.freerepublic.com, about the incident.

Tamburo argues that Henry's statement that he committed "hacking" and that he took data from non-public areas of her website are defamatory because they imply illegal activity. He claims that the statements are false because he did not evade any security measures employed on Henry's site, and no prohibition on robotic browsing was visible on the site.

The statements that Tamburo "wrote an agent robot to take specific files off of specific sites" and that the "files were not in a public venue" are substantially true and thus not actionable. Although Tamburo argues that the files were accessible to him through a URL, it is undisputed that Henry's site was designed to allow the user to search manually for the pedigree of an individual dog. Nothing in the record indicates that Henry intended to make the entire database available to the public. The "gist" of the statements is therefore true. *See J. Maki Constr. Co.*, 882 N.E.2d at 1186.

As to the word "hacking," Henry argues that the term is susceptible to innocent construction because "the term has positive connotations," implying the development of "a creative solution" to a computer problem. (Def.'s Mem. in Supp. of Mot. for Summ. J. 13-14, ECF No. 508-1.) The innocent construction rule "requires a court to consider the statement in

23

context and give the words of the statement, and any implications arising from them, their natural and obvious meaning." *Madison v. Frazier*, 539 F.3d 646, 653-54 (7th Cir. 2008) (quoting *Solaia Tech., LLC v. Speciality Publ'g Co.*, 852 N.E.2d 825, 839 (2006)). Courts "are to interpret the words of the statement as they appear to have been used and according to the idea they were intended to convey to a reader of reasonable intelligence," and "should avoid straining" to give a term an innocent meaning. *Seith v. Chicago Sun–Times, Inc.*, 861 N.E.2d 1117, 1127 (Ill. App. Ct. 2007). Although Henry proposes that the word "hacking" can be used to convey an innocent meaning, it is clear from the context of her statement that she meant to imply that the way Tamburo accessed her database was unethical or illegal, not "creative." Thus, the word, as used by Henry, was defamatory.

Even so, the statement is protected by the same qualified privilege that renders Henry's statements about theft non-actionable. Tamburo has presented no evidence showing that Henry abused the privilege. Although she admitted during her deposition that Tamburo had not evaded any security measures on her site, nothing in the record indicates that, at the time she made the statement about "hacking," on May 5, 2004, she had serious doubts about the truth of the statement. Rather, the evidence shows that Henry designed her website to make data available to the public through a query search, which would provide information about one dog pedigree at a time. There is no dispute that this was the way Henry intended the site to be used, and that Tamburo instead accessed the site in a way that allowed him to copy Henry's entire database.

Tamburo argues that the privilege does not apply because the statement was published to an unrelated website, freerepublic.com, and to persons who were not part of the dog breeding community. But Henry had a legitimate interest in the information in her database, and the question of whether it is legal to use a robot to harvest information from internet sites without the

24

permission of the website owners implicates legitimate public interests. There is no evidence that Henry failed to limit her communications to the "proper parties," because the segment of the public that had an interest in the statements was broad, and Henry made the statements as part of her earnest efforts to find a remedy for the misappropriation of her data.

4. Copyright Infringement

On May 5, 2004, Henry sent a message to Tamburo, copying the Schipperke Yahoo!Group, the American Kennel Club, and other breeders. She stated, "You cannot simply copy my database into yours without permission and start charging money for it. I have copyright statements on my site to boot." These statements are not actionable as defamation because they are substantially true. *See J. Maki Constr. Co.*, 882 N.E.2d at 1186. Tamburo copied Henry's database without her permission and charged money for the information, and Tamburo does not dispute that Henry had "copyright statements" on her site, though he does argue that the data itself was not copyrightable.

Alternatively, the statements are protected by the qualified privilege. Tamburo argues that copyright infringement is a crime and that Henry's statements imply that he infringed her copyright to her database. He argues that such statements were false because the information on Bonchien.com consisted of "facts" copied from other sources, and there is no copyright to such information. *See Feist Publ'ns*, 499 U.S. at 364. But whether Henry could successfully assert a copyright interest in her database is beside the point. Because Henry's statement is protected by a qualified privilege, to survive her motion for summary judgment, Tamburo must point to evidence that Henry made the statement with a reckless disregard as to its truth.

Tamburo argues that Henry knew the information in her database was copied from elsewhere and was not copyrightable. He points to her admission that lawyers told her she had

no legal remedy against the plaintiffs, and to her statement to the APDUG Yahoo!Group on May 9, 2004, in which she essentially admitted that the information was public data and that she had no legal recourse against Tamburo. But the exchange of messages and emails on May 4 and 5, 2004, shows that Henry and the other defendants were involved in a heated dispute with Tamburo as to whether Tamburo had violated copyright laws by copying the individual defendants' databases. Tamburo has presented no evidence indicating that Henry abused the qualified privilege by making a statement on May 5, 2004, about possible copyright violations with a reckless disregard for the statement's truth. Moreover, she made the statement to other members of the breeding community, who shared her interests in maintaining pedigree data and protecting the rights of those who had invested time and effort in compiling the data.

     5. Deleting/Removing Data from Bonchien.com

Tamburo claims that Henry published statements that falsely implied that Tamburo had deleted data from her website. Specifically, he points to her statements to the APDUG Yahoo! Group that members should "spread the word far and wide that he took for himself something that was so unethical to do, and now you have to pay to see it," and that the information was being "held hostage." Tamburo argues that these statements were false because Henry knew that the information remained available on her site and had not been removed.

The court concludes that the statement that Tamburo "took" the data "and now you have to pay to see it" is not actionable as defamation because it susceptible to an innocent construction. Under Illinois law, "if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 925 (7th Cir. 2003) (citing *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill.1996)). Here, a reasonable—indeed the only plausible—interpretation of Henry's

statements is that Henry was making the Schipperke data available for free, while Tamburo was attempting to sell access to it, and that Henry wanted the group members to "spread the word" that breeders did not have to pay for the pedigree information because she and other website owners would continue to provide it to them. Henry stated in the same message, "We can also get the word out that we have the data for free." As to the statement that Tamburo was holding the data "hostage," that statement is reasonably construed as meaning that Tamburo was asking people to pay for the data, not that Tamburo had removed Henry's data from her site and was demanding payment for its return.

The court further notes that the statement that the data was being "held hostage" is rhetorical hyperbole, which is not actionable. *See Hopewell*, 701 N.E.2d at 103-04. The United States Supreme Court has characterized language as "rhetorical hyperbole" where, in context, it is obviously understood as an exaggeration, rather than a statement of literal fact. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) (in context, the word "blackmail" referred, not to a criminal act, but to unreasonable negotiating practices); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284-86 (1974) (characterization of union "scab" as a "traitor" was understood to convey reprehensible actions, not actual treason). Here, "hostage" was not used literally to mean that Tamburo was holding the data for ransom; it merely meant that Tamburo was charging for it.

## D. Count IX: Defamation *Per Quod*

"When a defamation claim is one for defamation *per quod*, . . . a plaintiff must show special damages, i.e., actual damages of a pecuniary nature, to succeed." *Hukic v. Aurora Loan Serv.*, 588 F.3d 420, 438 (7th Cir. 2009). Tamburo has presented insufficient evidence of special damages to proceed on his defamation *per quod* claim. In support of his claim to have suffered

damages, he states that Versity had sales of $3,538.98 between May 1-4, 2004, and sales of $184.60 between May 5-7, 2004. He then claims, based on those figures, to have suffered over $2 million in lost sales to date.

This estimate of damages is based on nothing but conjecture. There is no support in the record for such a calculation, and no basis on which to link the alleged lost sales to the alleged defamation. Tamburo does not point to any cancelled contracts that resulted from Henry's statements, and he provides no evidence regarding Versity's sales between the time TBS was launched in January 2004 and May 1, 2004. Many factors determine the success of a business venture over time. Tamburo's claim that Versity would have made millions in profits over nine years had it not shut down after a few months "is far too speculative and uncertain to entertain as special damages." *Maag v. Ill. Coalition for Jobs, Growth, and Prosperity*, 858 N.E.2d 967, 976 (Ill. App. Ct. 2006) (internal citation and quotation marks omitted). Henry is therefore entitled to summary judgment on Count IX.

## IV. CONCLUSION

For the reasons explained above, summary judgment is granted in favor of Henry on Counts II, IV, VIII, and IX.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   September 26, 2013

/em

28